Igor Niman, Esq.
Attorney at Law
1909 East 17th Street
Brooklyn, NY 11229
Phone: (718) 382-1689
Fax: (718) 228-6633

October 4, 2015

Hon. George B. Daniels
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

        Re: United States v. Victor Natanzon
        Docket No.: 11-CR-123-01

**SENTENCING MEMORANDUM OF DEFENDANT VICTOR NATANZON**

This Memorandum is hereby respectfully submitted in aid of this Honorable Court's Sentencing of Defendant Victor Natanzon, currently scheduled for October 7, 2015. Mr. Natanzon has pled guilty to an information on February 8, 2011 in front of U.S. Magistrate Judge Theodore H. Katz.

By means of this sentencing memorandum Defendant Victor Natanzon objects to the loss amount attributed to him in Presentence Investigation Report("PSR"), in the amount of $10 million.

Specifically, in paragraph 85, PSR provides for a 20-level enhancement due to the loss attributable to Mr. Natanzon's kickback payments in the amount $10 million.

Defendant relies on the §5K1.1 letter submitted by the Government in connection with the instant case, as primary source of facts with respect to the instant submission.

As the Court is aware, having presided over the trial of defendants Mark Mazer, Gerard Denault and Dimitry Aronshtein, where Mr. Natanzon testified over two days, the culpable conduct of Mr. Natanzon in the instant scheme, consisted of payment of kickbacks to Mark Mazer in exchange for providing business to the company owned and controlled by Mr. Natanzon, Prime View ("PV").

PV was a staffing firm that was locating, interviewing, evaluating and finally providing suitable computer consultants for the CityTime project. The individuals that were selected to work for the CityTime project became employees of PV and were billed according to the rates that were

provided to PV by Technodyne, which in turn billed these employees to SAIC, which in turn billed the City of New York, on cost plus per hour basis. (Tr. 1160).

Mr. Natanzon would pay to defendant Mark Mazer 80% of the profits that were received by PV from Technodyne. In order to arrive to that amount, Mr. Natanzon would subtract the total amount employees' salaries from the amount paid by Technodyne, for the requisite time period and multiply the difference by 80%.

The amount listed in paragraph 85 of the PSR reflects the number that Mr. Natanzon eventually paid to defendant Mark Mazer.

It is undisputed that the final product –the CityTime program was delivered and is a viable, working product that allows the City of New York to track its numerous employees. The Government consents, via §5K1.1 letter, that Mr. Natanzon was not in a position of authority on the City Time project nor did not commit fraud on the City nor participated in a conspiracy to commit fraud on the City.

He was not in the position to negotiate the rates with the City, but was simply handed down the rates at which he, via his company Prime View, could bill Technodyne for the services of Prime View's employees. On the other hand, Mr. Natanzon was not in privy to discuss the comparability of the rates that his company charged Technodyne versus rates that other vendors charged the City of New York for the services of computer consultants in similar projects.

Having said that, it is undisputed that the employees of Prime View provided significant input, via work performed and services rendered, towards completion of the CityTime project. By not participating in a conspiracy to commit fraud on the City, Mr. Natanzon was not aware of any employees who were billing their work and did not do anything in exchange.

To the contrary, Mr. Natanzon was getting numerous phone calls from his employees who were complaining of the amount of work that had to be done for the project and the pressure that they experienced during their work at the CityTime Project.

Therefore, the amount of the kickbacks that Mr. Natanzon provided to Mr. Mazer, constituted the profit i.e. compensation for the services rendered to the City, via the CityTime project, albeit received by Prime View by illegal means.

The Guidelines define "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A). Actual loss is the relevant measure in this case and is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." Id. cmt. n. 3(A)(i).

Application Note 3(E)(i) to U.S.S.G. §2B1.1. provides:

(E) Credits Against Loss − Loss shall be reduced by the following:

    (i)    The money returned, and the fair market value of the property returned and the services provided, by the defendant or other persons acting jointly with the

> defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

In this instance, the services provided by the employees of Prime View, were provided from the time of the initial involvement of Mr. Natanzon on the CityTime project until 2010, when the offense was detected by the government agency.

It is believed, that entire the amount of $10 million should be offset by the amount of services provided by the employees of Prime View towards the victim, i.e. the City of New York.

On the other hand, the funds attributed towards payment of work not performed, billed via false time sheets, should be counted against Mr. Natanzon.

The Courts had credited defendants with the value of the services rendered in several cases. For example, in U.S. v. Anders, 333 Fed. Appx. 950, 954-955 (6th Cir. 2009), the Court determined that, although a construction contractor committed fraud in the bidding process to secure a contract, the contractor was entitled to the credit for the value of services rendered before the customer cancelled the contract.

In U.S. v. Rothwell, 387 F.3d 579, 581 (6th Cir. 2004), the defendant used a portion of SBA loan to fund work on another property but submitted invoices to the SBA stating that he used the loan to fund work on the SBA-funded property. The district court calculated loss as a share of the amount the SBA lost in the foreclosure sale. Id. at 581-582. The Court of Appeals remanded stating that the district court "ignored the causation requirement inherent in the rules for determining loss." Id. at 583. The Court of Appeals reasoned that the defendant's act of submitting false invoices could not "be reasonably considered to have caused the SBA's loss under either a 'but for' or legal cause analysis." Id. at 584.

Several other circuits have also found that Application Note 3(E)(i) permits credit against intended loss for "money returned." See, U.S. v. Geeslin, 447 F.3d 408, 410-11 (5th Cir. 2006) (permitting such a credit based on Application Note 3(E)(i) )); U.S. v. Brownell, 495 F.3d 459, 463-464(7th Cir. 2007); U.S. v. Nichols, 416 F.3d 811, 819 (8th Cir. 2005).

In U.S. v. Blitz, 151 F.3d 1002, 1012 (9th Cir.1998), the Court recognized that "value may be rendered even amid fraudulent conduct," and that in calculating loss, the district court should give credit for any legitimate services rendered to the victims. See also, U.S. v. Campbell, 765 F.3d 1291, 1305 (11th Cir. 2014) (affirming District Court's decision to credit defendant with 1.4 million of funds returned or services rendered to the victims).

Finally, in U.S. v. Klein, 543 F.3d 206, 214 (5th Cir. 2008), the Court held that "[a] straightforward application of the guidelines requires discounting the actual loss by the value of the drugs dispensed."

In this particular case, the Defendant believes that the services provided by his employees, through the entire duration of the project, should be credited against the loss calculated.

Before hand, it is important to determine "the net detriment to the victim, rather than gross amount of money that changes hands." U.S. v. Hausmann, 345 F.3d 952, 960 (7th Cir. 2003).

In addition, the Government stated in its §5K1.1 letter that "the information Natanzon provided … was further useful in helping secure the guilty pleas of Svetlana Mazer and Larisa Medzon." Thus, Defendant believes that under U.S. v. Garcia, 926 F.2d 125, 127 (2nd Cir. 1992), the Defendant should be credited with downward departure for "breaking the logjam."

Furthermore, according to Government's §5K1.1 letter "[W]hen Natanzon ran into Mazer at Pretrial Services, Mazer effectively told him to keep his mouth shut. Natanzon saw Mazer as a hugely powerful person in the City, with deep connections to City government and to the police department based on his leadership role on the CityTime project. Accordingly, Natanzon's decision, despite Mazer's admonition, to cooperate with the Government required courage and willingness to accept responsibility despite the potential consequences." Thus, Defendant believes that he may be entitled to a downward departure under §5K2.0. See, U.S. v. El-Gheur, 201 F.3d 90, 93 (2nd Cir. 2000) (noting that district court departed based on retaliation against defendant and his wife for his cooperation).

**Conclusion**

Based upon all of the above outlined factors, the undersigned moves this Honorable Court to grant Fatico hearing to resolve Guidelines issues as to the amount of loss and then a downward variance to time-served.

Respectfully submitted,

/s/
Igor Niman

Cc:   AUSA Andrew D. Goldstein (by email)
      U.S. Probation Officer Tandis Bruno (by email)